UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SEAN MICHAEL MYERS, and                CASE NO. _____
DAKOTA BLUE SERNA
         Plaintiffs                     HON. _____
v.

RUTH JOHNSON MICHIGAN                  PLAINTIFFS' MOTION FOR TRO
SECRETARY OF STATE,
CHRISTOPHER THOMAS DIRECTOR
OF BUREAU OF ELECTIONS, and
BOARD OF STATE CANVASSERS,
(sued in their official capacities)
         Defendants.

---

Thomas Lavigne (P58395)            Michael Komorn (P47970)
Cannabis Counsel PLC Law Firm      Law Offices of Michael Komorn
Attorneys for Plaintiffs           Attorneys for Plaintiffs
2930 Jefferson Avenue East         30903 Northwestern Highway, Ste. 240
Detroit, MI 48207                  Farmington Hills, MI 48334
(313) 446-2235                     (800) 656-3557
tom@cannabiscounsel.com            michael@komornlaw.com

---

### PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER

    Sean Michael Myers and Dakota Blue Serna hereby moves for a temporary injunction,

pursuant to FRCP 65(b) against Defendants RUTH JOHNSON MICHIGAN, SECRETARY OF

STATE, CHRISTOPHER THOMAS DIRECTOR OF BUREAU OF ELECTIONS, and BOARD

OF STATE CANVASSERS, to stop any printing of ballots and to count the signatures, and if

enough, then to put on the ballot, the people's initiative petition filed by Ballot Question

Committee, MICHIGAN COMPREHENSIVE CANNABIS LAW REFORM COMMITTEE

a/k/a MILEGALIZE, which Plaintiffs circulated and signed along with over 350,000 elector

citizens, more than enough to qualify for the ballot, except that Plaintiffs circulated and signed

the petition over 180-days before filing of the petition, and had Plaintiffs recirculated to the same

signers or re-signed was/is a violation of elections law and both signatures are disqualified by

Defendants as a policy.


September 8, 2016.                          S/Thomas Lavigne_____
                                           Thomas Lavigne (P58395)
                                           Law Firm of Cannabis Counsel PLC
                                           2930 Jefferson Avenue East
                                           Detroit, MI 48207
                                           (313) 446-2235
                                           Michael Komorn (P47970)
                                           Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

SEAN MICHAEL MYERS, and                    CASE NO. _____
DAKOTA BLUE SERNA
                    Plaintiffs                         HON. _____
v.

RUTH JOHNSON MICHIGAN                      BRIEF IN SUPPORT OF
SECRETARY OF STATE,                        EX PARTE MOTION FOR TRO
CHRISTOPHER THOMAS DIRECTOR
OF BUREAU OF ELECTIONS, and
BOARD OF STATE CANVASSERS,
(sued in their official capacities)
                    Defendants.

_____

Thomas Lavigne (P58395)              Michael Komorn (P47970)
Cannabis Counsel PLC Law Firm        Law Offices of Michael Komorn
Attorneys for Plaintiffs             Attorneys for Plaintiffs
2930 Jefferson Avenue East           30903 Northwestern Highway, Ste. 240
Detroit, MI 48207                    Farmington Hills, MI 48334
(313) 446-2235                       (800) 656-3557
tom@cannabiscounsel.com              michael@komornlaw.com
_____

**BRIEF IN SUPPORT OF PLAINTIFF'S EX PARTE MOTION FOR**

**TEMPORARY RESTRAINING ORDER**

Sean Michael Myers and Dakota Blue Serna hereby move for a temporary injunction,

pursuant to FRCP 65(b) against Defendants RUTH JOHNSON, MICHIGAN SECRETARY OF

STATE, CHRISTOPHER THOMAS DIRECTOR OF BUREAU OF ELECTIONS, and the

BOARD OF STATE CANVASSERS.

The relief requested is to order Defendants to stop any printing of ballots, which may

otherwise begin printing the end of this week, and to count the signatures, and if enough, to put

on the November 2016 electoral ballot, the people's initiative petition filed by Ballot Question

Committee, MICHIGAN COMPREHENSIVE CANNABIS LAW REFORM COMMITTEE a/k/a MILEGALIZE.

Plaintiffs circulated and signed said petition along with over 350,000 elector citizens, more than enough to qualify for the ballot, except that Plaintiff signed over 180-days before filing of the petition, and to have re-signed is against election law and both signatures are disqualified by Defendants, by policy if someone signs twice.

While federal law does not provide for ballot question petitions, if a state constitution like Michigan's provides the power of the people's initiative, then it must be provided to the people with due process of the law, both procedural and substantive, equal protection and upholding the core free speech expressed by Plaintiff by signing this petition, a registered voter in Michigan. *Brock v Thompson*, 948 P2d 279, 287 fn 25; 1997 OK 127 (Okla 1997). In this case, Defendants have violated Plaintiff's federal 5th and 14th Amendment due process and equal protection rights and Plaintiffs' 1st Amendment rights of freedoms of speech and association. U.S. Constitution First, Fifth and Fourteenth Amendments.

Rule 65(b) of the Federal Rules of Civil Procedure provides for a temporary restraining order ("TRO") without notice. The factors in granting a TRO were discussed in, *Northeast Ohio Coalition for Homeless v. Blackwell*, 467 F. 3d 999 - Court of Appeals, 6th Circuit 2006:

**(1) whether the movant has a strong likelihood of success on the merits,**

**(2) whether the movant would suffer irreparable injury absent an injunction,**

**(3) whether granting the injunction would cause substantial harm to others, &**

**(4) whether the public interest would be served by granting the injunction.**

To determine whether a TRO should be stayed, the **court** considers the same factors considered in determining whether to issue a TRO or preliminary injunction. *See Summit County, 388 F.3d at 550.* Those factors are **(1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable**

injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay. *Id.; Nader v. Blackwell*, 230 **F**.3d 833, 834 (**6th** Cir. 2000). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 **F**.2d 150, 153 (**6th** Cir.1991). For example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay. *See id.*

The attached Affidavits of Plaintiffs attest to specific facts about these TRO factors argued below; and the attached certificate of attorney states that the state attorney general office was noticed as they were emailed the pleadings and a telephone call made September 8, 2016 asking for concurrence in this motion, which was refused by Defendants' attorney general.

## (1) WHETHER THE MOVANT HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS

From court pleadings filed in state court proceedings by Defendants, it appears there is general agreement that:

- At the time of this filing, the subject initiative is the only initiative Defendant needs to canvass this year and there is conceivably time to canvass and place Plaintiff's initiative on the November 8, 2016 ballot in compliance with all statutory deadlines if the Court orders relief with a set schedule for compliance;

- MiLegalize, by law and custom, had more than 180 days to petition, with a time period between gubernatorial elections, minus 160 days prior to election to placed on the ballot, and MiLegalize timely submitted more than 354,000 potentially valid voter signatures, including Plaintiff's, on a petition form approved by Defendants;

- By statutory law Defendants use the Qualified Voter File (QVF) to canvass all petitions including the one signed by Plaintiff, and Defendants would use the QVF to canvass even

the signatures for rebuttal. The 1986 BOC policy to rebut signatures has never been used

or enforced on any other person and cannot actually be reasonably complied with by any

person;

- MiLegalize has already submitted rebuttal information that is equal to or superior to any

  other quantum of proof that approximately 138,000 signatures older than 180 days at the

  time of filing are rebutted and that the persons, including Plaintiff, were registered to vote

  at both the time of signing and within 180 days of filing;

- MiLegalize has an additional approximately 216,000 potentially valid signatures that are

  either less than 180 days old or that may be rebutted if any canvass concludes the

  signature is not of a qualified elector;

- There is no allegation that MiLegalize submitted less than the required 252,523 required

  signatures on the petitions signed by Plaintiff—i.e. more than enough valid signatures for

  ballot qualification have been submitted to Defendants.

The US Supreme Court and Sixth Circuit agree on the basic principles:

> The initiative process is not guaranteed by the U.S. Constitution (*Taxpayers United for Assessment Cuts v. Austin*, 994 F.2d 291, 295 (6th Cir.1993)), but once a state confers upon its citizens the opportunity to participate in the initiative process, it may not limit that state-created right in contravention of federal fundamental law. *Meyer v. Grant*, 486 U.S. 414, 422-424, 108 S.Ct. 1886, 1892-93, 100 L.Ed.2d 425 (1988) (the right to circulate an initiative petition is "core political speech").

*Brock v Thompson*, 948 P2d 279, 287 fn 25; 1997 OK 127 (Okla 1997). See also *Moore et al v*

*Johnson*, No 14-11903, slip opinion p 9 (USDC ED MI, S Div; May 23, 2014)  (John Conyers

case):

> "The Registration Statute is, in all material respects, indistinguishable from the statute held facially invalid by the United States Court of Appeals for the Sixth Circuit in *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008). The Sixth Circuit in *Nader* held that it was "undisputable" that the plaintiff suffered a serious limitation on his First Amendment rights – a limitation triggering application of strict scrutiny

– when the statute was applied so as to disqualify signatures gathered by non-registered voters and to keep the candidate off the ballot. *Id*. at 475, 478. That is exactly what happened in this case. The Registration Statute was applied so as to disqualify Mr. Conyers' signatures and keep him off the ballot. *Nader* holds that this amounts to a severe burden on Mr. Conyers' First Amendment rights and requires the application of strict scrutiny. *Id*. at 475, 478. The reasoning of *Nader* also compels the conclusion that application of the Registration Statute severely burdened the First Amendment rights of the Plaintiffs who gathered the signatures that were disqualified.

The Registration Statute cannot survive strict scrutiny because it is not narrowly tailored to serve a compelling state interest. The State's asserted interest is detecting and preventing election fraud. (*See, e.g.,* ECF #27 at 25, where Secretary Johnson argues that "if strict scrutiny is required, the burden on Plaintiffs is justified by the State's compelling interest in preventing fraud.") Requiring circulators to register, Secretary Johnson contends, helps to combat fraud because the State knows where to find a registered voter "if questions arise regarding the validity or genuineness of signatures" (*id.*), and the State has the ability to subpoena a registered voter to provide testimony, if needed, in an investigation or prosecution of election fraud.

The State's interest in combatting election fraud is compelling, but the State may protect that interest through a less restrictive means."

Similar to the Conyers case, Plaintiff's First Amendment rights, as circulators and signors is being impermissibly burdened, and the state has no compelling interest. Even if the state does have a compelling interest of preventing fraud, using the QVF rather than the 1986 policy is how the state can accomplish that interest, and it can be accomplished through less burdensome and more narrowly tailored means.

The federal courts have viewed denial of ballot access with "general agreement" that these statutes "merit the closest examination" and cannot survive strict scrutiny review. *Moore Id*. citing *Libertarian Party of Virginia v Judd*, 718 F.3d 308, (4th Cir 2013) at 316-17.    Since *TUAC v Austin*, the Sixth Circuit has recognized that "Nader's petition circulation activity constitutes core political speech, and any regulation of that speech is subject to exacting scrutiny. See *Buckley v American Constitutional Law Foundation, Inc*], 525 U.S. at 192 n. 12, 119 S.Ct. 636; id. at 210-11, 119 S.Ct. 636 (Thomas, J., concurring) (applying strict scrutiny because registration

requirement impacted core political speech).” *Nader v Blackwell*, 545 F3d 459, 475 (CA 6, 2008).

This rule applies to the context of recalls in Michigan as well: “The circulation of recall petitions

is core political speech.” *Bogaert v Land I*, 572 F Supp 2d 883, 900 (USDC WD Mich 2008). In

its second opinion, which came after *Nader v Blackwell* had been published, the *Bogaert v Land*

court went into more detail:

> This Court held in its opinion on the motion for preliminary injunction that Plaintiff
> had a substantial likelihood of prevailing on the merits because recall-petition
> speech is core political speech, it is subject to strict scrutiny, and the district
> residency and registration requirements are not narrowly tailored to achieve
> Michigan's compelling interest in the integrity of recall petitions and the combat of
> election fraud. (Dkt. No. 37, Op. 30-39.) *Bogaert v Land II*, 675 F Supp 2d 742,
> 749 (WD Mich 2009).

In this instance, Plaintiffs’ signatures and the other petition signers are being denied

initiative ballot access, under color of law, due to a constitutionally suspect 1986 BOC policy that

has never been enforced and is the epitome of not being the least burdensome means to achieve

the state’s interest (it is more like the most burdensome way), nor is it narrowly tailored. The

consensus among experts is that the policy cannot even be reasonably be complied with imposing

an undue burden on Plaintiffs’ free speech, association, equal protection and due process rights. It

has never been enforced. No one has even attempted to comply with it since 1986 until MILegalize

made good faith attempts in the past 7 months and found it impossible to comply, i.e. it was so

unduly burdensome it made exercise of rights illusory. The 1986 BOC policy does not even

achieve the state’s interest in the purity of elections because signor affidavits are not a sufficient

quantum or proof for qualified elector status. Plaintiff’s argument of using the QVF would go

farther in furthering the state’s interest of preventing fraud and ensuring qualified electors are

petition signors than even the Defendants are attempting to do. The Bureau is directed to use the

QVF to canvass petitions as it is…. so how can Defendants argue that a 1986 policy that is

unworkable is superior to the command of state law? It is of course, absurd, and the 1986 BOC policy must be declared unconstitutional on its face and as applied.

MILegalize is prepared to rebut signatures if MCL 168.47a is not declared constitutional, but like any rebuttable presumption, MILegalize is entitled to rebut once confronted with something to rebut by the BOE in its sample of MILegalize's petitions. Plaintiff deserves that due process. The first order of business is for the BOE to canvass the petitions. If the canvass actually reviews the signatures for qualified elector status as Appellants are required to do, then Defendants can only refuse to count those signatures if they are known to be defective, void for some other reason, or not potentially rebuttable.

## BACKGROUND ON THE MICHIGAN STATUTORY INITIATIVE PROCESS

1.      Plaintiff restates each previous allegation as if restated herein.

2.      The rights to initiate citizen legislation by petitioning were intended by the framers of the 1908 and 1963 Constitutions to be a citizen-utilized fundamental check and balance on government, a right granted by the People, to themselves as the People, an equal if not superior right granted in the same Constitutions to the Legislature itself.

3.       Michigan's 1908 constitution established the initiative only for constitutional amendments. A vote of the people amended it in 1913 to include statutory initiatives. The gubernatorial periods at this time were 2 years, and campaigns were able to petition for at least the gubernatorial period.

4.      Michigan voters have had at least the time period between gubernatorial elections (in 1908 it was every 2 years, for post-1963 Constitution it is up to at least 4 years) to collect signatures for an initiative.

5.       There was little change until 1941 when another amendment gave defendants power to check the names appearing on petitions against the names of registered voters.

6.      The same year by PA 246 the legislature enacted the election law. In 1954 it was repealed and re-enacted as our present law by PA 116, except the 1954 act now requires defendants to prepare a 100-word statement to appear on the ballot stating the purpose of a measure which reaches that stage.

7.      Michigan's 1963 Constitution, Art 2 Sec 9, grants the right of initiatives to the People.

8.      In Michigan, citizens can amend their constitution under Art 2, Sec 12, or create a new state statute through the initiative process under Art 2, Sec 9. Between 1963, when the Michigan Constitution enabling citizen initiative went into effect, and 2014, 31 proposed amendments to the state's constitution appeared on the ballot through the initiative process. Michigan voters approved ten of those 31 proposed amendments. In that same time, 13 initiatives to change or create state statutes appeared on the Michigan ballot through citizen initiative. Seven of those initiatives passed. Additionally, some proposed citizen initiatives were passed into law by the Michigan legislature without going to the ballot, but after sufficient signatures were collected to place the matter before the legislature.[1]

9.      At the 1963 constitutional convention, there was serious debate about the right to petition actually being able to be a right that citizens could exercise, and not being so burdensome that it was utilized primarily or wholly by special interest groups. At the time, the framers cited concerns that only well-organized and well-financed organizations could muster the necessary signatures, specifically mentioning the "UAW-CIO, 'school groups', and the Farm Bureau", that could end up being the primary utilizers of the right rather than ordinary citizens groups like MILegalize, signed by Plaintiff.

---

[1] https://*ballotpedia.org/History_of_Initiative_%26_Referendum_in_Michigan*.

10.     Upon information and belief, and upon attestation, in the current political climate, most if not all initiatives that qualify for the ballot have to raise a minimum of $2 million in order to have the resources to run and manage the scale and type of campaign necessary to qualify.

11.     Upon information and belief, in the last few years, the primary funders of statutory initiatives in Michigan have been labor groups, the chamber of commerce or its affiliates, particular industries, or supported by billionaires.

12.     Of most importance to this case is the distinction between statutory and constitutional initiatives. In 1971 the supreme court decided *Wolverine Golf Club v Secretary of State*, 384 Mich 461; 185 NW2d 392 (1971). The case involved a statutory initiative about daylight savings time. The court affirmed a lower court which ordered canvassers to accept and canvass statutory initiative petitions, though they were filed less than "10 days before the beginning of a session of the legislature," in violation of MCL 168.472. The statute had stood on the books for 30 years. The reason: article 2 section 9 did not permit the 10-day requirement:

> We do not regard this statute as an implementation of the provision of Const.1963, art. 2, § 9. We read the stricture of that section, "the legislature shall implement the provisions of this section," as a directive to the legislature to formulate the process by which initiative petitioned legislation shall reach the legislature or the electorate. This constitutional procedure is self-executing.
> As pointed out by Judge Lesinski in the opinion below ... :
> "It is settled law that the legislature may not act to impose additional obligations on a self-executing constitutional provision. [citing cases]: 'The only limitation, unless otherwise expressly indicated, on legislation supplementary to self-executing constitutional provisions is that the right guaranteed shall not be curtailed or any undue burdens placed thereon.'"
> Whether we view the ten day filing requirement in an historical context or as a question of constitutional conflict, the conclusion is the same – the requirement restricts the utilization of the initiative petition and lacks any current reason for so doing.
>
> We hold that the petitioners were entitled to file their initiative petitions without regard to the ten day before session requirement..... *Woodland v Michigan Citizens Lobby*, said similarly of article 2 section 9:

> [It] is a reservation of legislative authority which serves as a limitation on the powers of the Legislature. This reservation of power is constitutionally protected from government infringement once invoked; once the petition requirements have been complied with, the state may not refuse to act.

13.     An example of permissible "supplementary" legislation would be paper-size and type-size requirements for petitions, all of which Plaintiff complied with as its petition was approved by the BOE and BOC.

14.     In 1973 the legislature amended the election law by adding 472a, the 180-day rebuttable presumption statute. The statute purports to apply to both types of initiative, statutory and constitutional.

15.     MCL 168.472a is silent on the time period for how long a signature can be rebutted, but based on the Art. 2, Sec. 9, the historical periods, precedents, and language for longer periods, the 1974 OAG opinion, and case precedent, 4 years is the most logical time period.

16.     Between enactment of the 1963 Constitution and MCL 168.472a in 1973, petitions were circulated for 4-year periods without any distinction for qualifying staleness of signatures beyond 180 days or for any time period whatsoever.

17.     The popular bottle deposit initiative was enacted during this time period. *Consumers Power* aides our understanding of the 1986 policy that what it does not do is define the initiatory petition period to 180 days, or any length, for that matter.

18.     While Plaintiff does not concede that the 180-day restriction is not facially invalid; any ruling upholding the legislature's ability to retrospectively apply such forms of "legislative aid . . . in the areas of circulation and signing" (*Consumers id. at 9*) would seem to arm the legislature with an unbridled means to circumvent and impede the initiative process whenever it sees fit, violating Plaintiff signer's First Amendment free speech and association rights and Fourteenth Amendment due process rights.

19.     Considering initiatives are a crucial component of an effective checks and balances system built into the Michigan Constitution, use by citizens of such a tool must be scrupulously guarded, just like the independence of the judiciary. The Legislature cannot legislate away fundamental rights without a vote of the People to change the 1963 Constitution itself, without violating Plaintiff signer's First Amendment free speech and association rights and Fourteenth Amendment due process rights..

20.     From 1973 to 1986, the BOE and BOC did not enforce the rebuttable presumption against signatures older than 180 days because Attorney General opinions declared and the general consensus of those in the know at the time was that it was unconstitutional.

21.     In 1974 in OAG 4813, the attorney general (AG) opined the 180-day statute unconstitutional as to both types, with differing reasoning for each type. As to article 2 section 9 the AG wrote:

> This provision has been held to be self-executing [citing *Wolverine Golf Club*]. Although that provision concludes with language to the effect that the legislature should implement the provisions thereof, such language has been given a very limited construction by the Michigan Supreme Court, which held that this provision is merely:

> "... a directive to the legislature to formulate the process by which initiative petitioned legislation shall reach the legislature or the electorate...." ....
> I am consequently of the opinion that, as applied to signatures affixed to petitions which initiate legislation ... [the 180-day statute] is beyond the legislature's power to implement said section and is therefore unconstitutional and unenforceable.

22.     Attorney General Frank Kelley further opined in OAG 4813, and repeated the language in OAG 5528:

> In OAG, 1973-1974, No 4813, p 171, 174 (August 13, 1974), it is stated:
> 'In other words, petitions and the signatures affixed to them are valid for as long as a particular basis (votes cast) remains in effect. 1963 Const, art 12, Sec. 2 and art 2, Sec. 9, both provide that the requisite number of signatures to initiative petitions is to be determined by a set percentage of votes cast for all candidates for governor at the last preceding general election at which a governor was elected. Therefore, the term for

> governor determines the time periods during which petitions may be circulated for signature and any signatures gathered during such a period are valid. Under 1963 Const, art 5, Sec. 21, the governor serves a period of four years. Hence, signatures on petitions are to be considered valid so long as they are gathered during a single four-year term bounded on both sides by a gubernatorial election.'

23.   In the ensuing 12 years, initiative petitions, including some with signatures gathered more than 180 days before, were filed with the election bureau, certified by the canvassers, and approved by vote of the people.

24.   In 1986 in *Consumers Power v Attorney General,* 426 Mich 1 (1986), the supreme court affirmed a judgment of the circuit court which overruled OAG 4813, but only "as applied" to constitutional initiatives under article 12 section 2. The supreme court reasoned:

> Of extreme importance to resolution of the present controversy is focus on the absence of a call for legislative action in [the 1908 constitution] and the clear presence of one in [article 12 section 2] as evidenced in the sentence: "Any such petition shall be in the form, and shall be signed and circulated in such manner, as prescribed by law.'"

25.   There is no similar call for legislative action in article 2 section 9. Accordingly the decision did not disturb the holding of OAG 4813 that the section was self-executing, and that the rebuttable presumption is unconstitutional as applied to statutory initiatives.

26.   In briefing *Consumers Power* in the circuit court, the successful plaintiff utility companies contrasted constitutional and statutory initiatives, arguing that unlike article 12 section 2, the purpose of article 2 section 9 was to "control legislative power" and "curb legislative authority":

> Restrictions by the legislature upon the right to initiate legislation are contrary to the purpose of art 2 § 9. Both art. 2, § 8 and § 9 are direct responses to suspicion of the Legislature.... Article 2, §§ 8 and 9, on the other hand, are antagonistic to legislative authority....
> The plaintiff companies repeated this in oral argument:
>
> After [the 180-day statute] was enacted the Attorney General in 1974 ... issued an opinion [OAG 4813] in response to an inquiry regarding Article 2, Section 9, and declared that Article 2, Section 9, was self-executing, and cited the provisions and the findings and teachings of both the Court of Appeals and the Supreme Court in

*Wolverine v Secretary of State....* The Attorney General was constrained to conclude that Article 2 section 9 was self-executing; and therefore, the attempt to regulate the submission of petitions to initiate legislation, which by statute had to occur 10 days prior to the beginning – or no later that 10 days prior to the beginning of a legislative sessions was unconstitutional.

Expressing no disagreement with the foregoing about article 2 section 9,
AG counsel pointed in the oral argument to the practical effect of the 180-day statute, particularly on un-moneyed grass-roots groups such as the plaintiffs in the present case:

[T]he convention comments, the delegates were concerned about limiting constitutional amendments or limiting the right of initiative to highly organized special interest groups rather than allowing access to this right by broad-based, loosely organized grass roots type organizations. If the circulation period is limited to six months, I would submit that it would effectively remove the right of the people as a broad-based group to go out and, I guess, casually, without a great deal of organization, without a great deal of money, to circulate petitions and come in with an adequate number. Exhibit 7, page 41.  29. The plaintiffs made no response to the AG's point about grass roots groups except to argue (successfully) the point was irrelevant in an action which (unlike the present case) arises under article 12 section 2.

27.    The pleadings from Consumers Power, both in the Circuit Court (complaint and order of Judge Bell), and the Michigan Supreme Court, only applied to constitutional amendments, not statutory initiatives, and made clear distinctions between the ability of the Legislature to regulate the process differently, with no authority for the legislature to regulate statutory initiatives.

28.    Noting the "silence" of the 1963 constitutional convention delegates on the issue of whether article 2 section 9 precludes aggregation of signatures collected before and after a gubernatorial election, the court of appeals held in a referendum case, *Bingo Coalition for Charity- - Not Politics v Board of State Canvassers*, it "does not."

29.    In August of 1986, in the throes of a hot summer shortly before that year's election, litigation occurred over the sudden enforcement of the rebuttable presumption as political forces conspired to and succeeded in erecting ballot access barriers to keep L. Brooks Patterson from placing a death penalty amendment before Michigan voters, as well as preventing a proposal that

would have allowed Michigan voters to vote to approve any utility rate increases. The BOC adopted, without any statutory or constitutional authority to do so, a policy for rebutting older signatures.

30.     Thirty (30) years later, for the first time since the policy was enacted in the summer of 1986, the BOC is attempting to force the proponent of an initiative to rebut the presumption posed by MCL 168.472a by either:

      a.   Proving that the person who executed the signature was properly registered to vote at the time the signature was executed and;

      b.   Proving with an affidavit or certificate of the signer that the signer was registered to vote in Michigan within the '180 day window period' and further, that the presumption posed under MCL 168.472a could not be rebutted through the use of a random sampling process.

31.     It is obvious from the language of the law and the policy that the consensus was and has been that campaigns could continue to petition beyond 180 days, but a laborious policy was enacted that may have deterred any persons from ever attempting to exercise their rights due to the burdensome and unachievable nature of the process.

32.     In 1998, the Qualified Voter File (QVF) was created pursuant to legislation. Historically local clerks maintained Michigan voter files in a decentralized fashion. With the creation of the QVF, the state has a centralized database of qualified electors. Michigan law states that anyone in the QVF is a qualified elector.

33.     Various laws required the BOE to use the QVF to canvass any petitions. The state legislative mandate of using the QVF to canvass supersedes and renders null and void the 1986

rebuttal policy of the BOC as a matter of law, and is also in conflict with the earlier enacted rebuttable presumption of MCL 168.472a.

34.     This being a conflict of laws issue, the more modern enactment of the QVF and its actual current use as customary by elections officials, contrasted with the never used 1986 policy, which would be absurd to implement and impossible to comply with, as well as more burdensome and costly for all parties, Plaintiff and Defendants, leads to a conclusion that the QVF canvassing mandate supersedes the 1986 BOC policy.

35.     In 1999 the legislature enacted a new election law, MCL 168.473b, again curtailing the period within which signatures for a statutory (and constitutional) initiative could be collected:

> Signatures on a petition to propose an amendment to the state constitution of 1963 or a petition to initiate legislation collected prior to a November general election at which a governor is elected shall not be filed after the date of that November general election.

36.     This seems to clarify the issue somewhat that the time period for any approved petition is between gubernatorial periods, generally.

37.     With very few initiatives ever qualifying due to the extreme burdens of ballot access, it is not often the legal or practical issues of initiative ballot campaigns receive the scrutiny of judicial review (approximately 7 have qualified at the ballot in the last 53 year, 1 every 7.57 years).

38.     The 1986 BOC policy was not publicly available online or in statute, or publications. It was, and largely remains, a policy unknown to even most election attorney specialists. Upon learning that the BOC had enacted a policy for rebuttals, MILegalize reviewed the policy and concluded it was logistically and financially impossible to comply with it.

39.     Starting in December of 2015, representatives of MILegalize participated in numerous hearings with the BOC to demonstrate that the process for rebutting signatures was unconstitutional and explore whether the policy was open for amendment to something more

narrowly tailored and less burdensome, which also would avoid litigation. The BOE staff, apparently cognizant that the 1986 policy was unlawful and unworkable, crafted several proposed policy revisions, all of which were not adopted by the BOC at several meetings over many months—ultimately culminating in a 2-2 split vote at a BOC meeting on May 12 2016, the effect of which was to not adopt Director Thomas's final proposal for county clerks to use the QVF to rebut signatures.

40.    Various members of the public, the state's top elections attorneys, and interest groups testified over a 5-month period regarding the rebuttable presumption policy. The majority of commentary was opposed to the 1986 policy and in favor of updating the policy to use the QVF to rebut signatures. The only opposition to a policy update came from the Michigan Chamber of Commerce and the oil and gas industry, whose opposition apparently was to the new policy possibly allowing an anti-fracking petition to qualify. Of the persons commenting on the policy fourteen of the eighteen were in favor of updating the 1986 policy.

41.    The original 1986 comments submitted at the time of the 1986 policy for historical perspective. The arguments discuss how statutory initiatives differ from constitutional amendments as the Legislature has no authority to meddle with the initiative process.

42.    At the December 3, 2015 BOC meeting, BOE Director Christopher Thomas stated in regards to the superiority of using the QVF rather than the 1986 BOC policy, "So our data [BOE] does show the exact history of where and when people were registered. So there is new data that did not exist back then."  The December 14, 2015 transcript is also attached.

43.    At the January 14, 2016 BOC meeting, BOE Director Thomas stated, "It was brought up by Mr. Hank[s] that the current state of voter registration has changed significantly with a qualified voter file and that it would be much more efficient to use that as a means to satisfy those two

requirements. We have concurred in that since the qualified voter file, in fact, does contain that information and could be made available to the petitioners for the purposes of assisting them in rebutting the stale signatures."  Thomas further stated that "….the Governor's term of office still applies….." in regards to the petition time period.

44.    At the same meeting, noted elections attorney Gary Gordon stated in regards to the lack of thoughtful consideration in crafting the 1986 BOC policy that, "The existing policy is not a policy that was adopted after --- after a long consideration, and we are treating it like its some kind of Holy Grail that was--- that was adopted after – after, you know, great thought and so on. This policy was adopted very precipitously by the Board…."

45.    At the same meeting, Gordon noted that there is no statutory definition of stale or void, and not much thought was given to the definitions of either term.

46.    Mr. John Pirich, another noted elections attorney, echoed Mr. Gordon's statements in discussion with Thomas about the vague nature of MCL 168.472a, and what the Legislature may have meant by those terms and how even those with the most elections experience could not agree on the definitions of the terms.  Ellis Boal, an attorney also testified and noted how Pirich and Gordon in their written comments to the BOC affirmed that no one knows what the term stale means.

47.    Mr. Thomas, a widely respected state official, went further in his comments, stating that in regards to the 1986 policy and constitutional and legislative prerogative, "…that we really should not rely on the policy developed in 1986 until such time as the legislature gives us clarity."

48.    Thomas further stated, in regarding the difference of burdens placed on petitioners between using the QVF versus the 1986 policy to rebut signatures, that an updated policy "….if adopted, would certainly make it much, much easier to rebut signatures…".

49.     Further testimony was provided by political and petitions expert Alan Fox, of Practical Political Consulting, whom provides MILegalize with services to rebut signatures, and who also has experience in challenging initiative petitions. Fox stated in regards to the 1986 policy, "It bears no resemblance to how petitions are validated now", and that the initiative process, particularly canvassing or attempting to rebut signatures is "….a monumental task; don't underestimate it. It's – it's not impossible, but it would be expensive and it will be time consuming in any petition organization that tries to do it will very rapidly discover that no matter how you do it, it's not an efficient process."

50.     At the March 7, 2016 meeting of the BOC, Director Thomas commented to the effect that in order for the BOE to canvass the petitions and do a random sample for validity as is common practice, the BOE would have to know whether to include signatures more than 180 days old. Prior discussion included that commentators recommended just sampling a petition submission, which is Plaintiff's position also.

51.     Gordon again testified on March 7, noting the lack of definition of stale and void and how different interpretations exist.

52.     At the same meeting Director Thomas stated that the logistics of the 1986 signor affidavits or clerk certifications were "…. a huge burden; no question about it." He also further stated an updated policy could "…..significantly reduce[d] the burden on the filer."

53.     At the March 24, 2016 BOC meeting, Jeffrey Hank testified how the BOE does not have an affidavit form even if a campaign would attempt to get, in the instance of Plaintiff, over 200,000 affidavits from signors.

54.     All undue burdens aside, without a guaranteed acceptable affidavit for individual signors, it would be unreasonable for Plaintiff to risk the effort and cost of securing signor affidavits only to find out after-the-fact that the affidavit form was insufficient.

55.     At the same March 24 meeting, Attorney Ellis Boal testified and discussed with Director Thomas, who affirmed that the BOE was applying the holding of Consumers to statutory initiatives, despite the language of the holding only applying to constitutional amendments.

56.     On April 25, 2016, BOC member Norm Shinkle, acting under color of law, abruptly left in the middle of a BOC meeting, breaking quorum and preventing further discussion and action on an updated policy. This caused some relative excitement as reporters chased Mr. Shinkle out of the State Capitol as he claimed that he had a client to meet as the reason he left the meeting.

57.     Nonetheless, MCL 750.478 makes it a crime for a public officer to engage in willful neglect of duty.

58.     At the May 12, 2016 BOC meeting, discussion continued on the policy update, with Director Thomas presenting an updated proposal to the BOC, and stating that the 1986 policy is "....pretty laborious process with 1500 city and township clerks and 83 county clerks." Mr. Thomas also stated how several local clerks had contacted the BOE and declined to rebut signatures, presumably for either Plaintiff or the Michigan Cannabis Coalition.

59.     Ultimately, the BOE put forward several updated proposals, none of which were adopted, acting under color of law.

60.     On May 28, 2016, three days before MILegalize's petitions, signed by Plaintiff, were due to the state if Plaintiff was seeking to be on the 2016 ballot, the Michigan House passed SB776 purportedly with immediate effect. The House vote broke down 57-52, largely along partisan lines, with all Democrats voting against it, and six Republicans also voting against it.  However SB 776

was not signed by the governor and made effective until after the MILegalize petition was filed and therefore does not apply.

61.    On June 1, 2016, MILegalize filed approximately 354,000 signatures, including Plaintiff's, on petitions to qualify for the statewide ballot. Any campaign seeking to place an initiative on the ballot had to submit at least 252,523 signatures to qualify.

62.    MILegalize submitted petitions with potentially more than 100,000 extra signatures than the minimum requisite threshold, including Plaintiff's signature.

63.    On June 6, 2016, under color of law, the BOE issued a staff recommendation to the BOC that MILegalize failed to submit enough signatures for ballot qualification due to more than 200,000 signatures, including Plaintiffs', being collected more than 180 days prior to submission, and the basis for not accepting those signatures was the 1986 BOC policy, acting under color of law.

64.    On June 6, 2016, Michigan Governor Rick Snyder signed into law SB776 with immediate effect, which for the first time in Michigan history would limit the time period that Michigan citizens have to circulate petitions for statutory initiatives and constitutional amendments.

65.    SB776 amended MCL 168.472a to:

> The signature on a petition that proposes an amendment to the constitution or is to initiate legislation shall not be counted if the signature was made more than 180 days before the petition is filed with the office of the secretary of state.

66.    It is apparently the position of the BOE that SB776's amended language does not apply to the subject MILegalize petition signed by Plaintiff, because they were filed with the state prior to the amendment being signed by the Governor, filed with the Great Seal, or made effective.

67.    Regardless which version of the 180-day statute is applied to Plaintiff, both violate Plaintiff's US Constitution al First Amendment right to freedom of speech and association and

Fourteenth Amendment rights to due process and equal protection, as it violates  article 2 section 9 of the 1963 Michigan constitution, under *Wolverine Golf Club v Secretary of State,* regardless that a later case *Consumers Power v Attorney General* upheld the rebuttable presumption language as applied to petitions to amend the constitution under constitution article 12 section 2.

68.    Article 2 section 4 of the constitution requires the legislature to "enact laws to regulate the time, place and manner of all nominations and elections, except as otherwise provided in this constitution."

69.    Article 2 section 9 covers both referenda and legislative initiatives (also called statutory initiatives).  Approved by con-con delegates in 1961-62 and enacted by the voters in 1963, it provides as to statutory initiatives:

> § 9 Initiative and referendum; limitations; appropriations; petitions.
> The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative.... The power of initiative extends only to laws which the legislature may enact under this constitution. ... To invoke the initiative ..., petitions signed by a number of registered electors, not less than eight percent for initiative ... of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.
> ...
> Any law proposed by initiative petition shall be either enacted or rejected by the legislature without change or amendment within 40 session days from the time such petition is received by the legislature....
> If the law so proposed is not enacted by the legislature within the 40 days, the state officer authorized by law shall submit such proposed law to the people for approval or rejection at the next general election....
> Any law submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon at any election shall take effect 10 days after the date of the official declaration of the vote. No law initiated or adopted by the people shall be subject to the veto power of the governor, and no law adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors unless otherwise provided in the initiative measure or by three-fourths of the members elected to and serving in each house of the legislature....
> The legislature shall implement the provisions of this section.

70.    Implementing statutes under article 2 section 9 are found at MCL 168.471 et seq. Together

they provide, in general terms, that an initiating entity asks defendant canvassers to approve the format of a petition, which must contain both a short summary and the exact wording of the proposed statute, including strikeouts of any provisions which will be eliminated. The initiator prints and distributes petitions to circulators who begin collecting signatures on a date chosen at the discretion of the initiator. The circulators get the signature, printed name, street address, voting jurisdiction, zip code, and date of signing from registered voters throughout the state who want to see the measure on the ballot. In signing, a signer asserts he/she is a "qualified and registered elector" on the "actual date the signature was affixed."

71.     After collecting sufficient signatures, the initiator files the petitions containing them with the defendants.

72.     The initiator may file the petitions at any time but in order to get the proposal on the ballot of a particular election, the filing must be by or before a cut-off date 160 days in advance. For the November 2016 election the cut-off date is June 1, which is when MILegalize filed.

73.     Under the version of MCL 168.472a applicable here (prior to SB776), signatures more than 180 days old on the date of filing are subjected to a rebuttable presumption against them. Under the amended version of SB776, those signatures would be rejected altogether.

74.     Defendants canvass the signatures. The term "canvass" is not defined and the method is not specified in the constitution or statutes. But it is "impossible to canvass" in a timely way every one of the hundreds of thousands of signatures on a petition. Accordingly the defendants typically choose a random sample of 500 or more signatures. They test the sample for validity using the "qualified voter file" (QVF).

75.     The state established the QVF in 1997 and it has evolved overtime. The QVF documents registered voters in the state. Any resident who is in the QVF is officially considered a voter

registered in Michigan. For every voter, the QVF includes the date of registration, street address, and other data. A document of defendant SOS, "The Michigan Qualified Voter File: A Brief Introduction," explains the nature of the QVF:

> While the QVF project was originally conceived as a response to the inefficiencies of the state's highly decentralized voter registration system ... the implementation of the National Voter Registration Act (NVRA) [52 USC 20501 et seq, a/k/a the 1993 "motor voter" law] greatly heightened the need for such an initiative. ... [T]he QVF links election officials throughout the state to a fully automated, interactive statewide voter registration database to achieve a wide variety of significant advantages....

76.     The testing process used by the BOE by utilizing a random sample of submitted signatures compared to the QVF determines a validity rate for signatures in the sample, expressed as a percent. This rate is then multiplied by the total signatures filed by the initiator. The product is said to be the number of qualified and registered elector signatures filed. Per article 2 section 9, for both 2016 and 2018 that number will be compared to 252,523, the number which is obtained by taking 8% of the number of those who voted for governor in 2014.

77.     There is no practical reason the current sampling method could not be used to test signatures more than 180 days old for qualified elector status, and that due to the acknowledgement that things like canvassing or rebutting signatures are "labor intensive" and inefficient, and how defendants "makes it easy…." to check qualified elector status, as well as preventing fraud, and "…..eliminating much of the paperwork involved in tracking changes in voter registrations….", there is no rational basis even for imposing the 1986 BOC policy on Plaintiff when the QVF exists.

78.     The SOS cites on its website that the QVF "Plays a Vital Role in Michigan's Election System[2]" (**emphasis added**):

> One of the unique challenges Michigan has faced is how to effectively administer

---

[2] Qualified Voter File (QVF)Plays a Vital Role in Michigan's Election System, available online as of June 14, 2016 at http://www.michigan.gov/sos/0,8611,7-127-1633_8716-27675--,00.html

an election system made up of election officials, administrators, clerks and poll workers from 83 counties, 277 cities, 1,240 townships and 256 villages.

Add to that more than 7.4 million registered voters and the magnitude of the problem quickly becomes apparent. With such a large electorate, even straight-forward tasks such as updating voter rolls when people move to new jurisdictions become **labor intensive**. Unlike many other states which keep election records at the county or state level, Michigan's voter registration and participation records are kept at the local level.

Given the size and complexity of Michigan's election system, one of the most significant developments to its elections management has been the Qualified Voter File (QVF).

The QVF is a statewide computerized system that has made a tremendous impact. Among its many benefits, the **QVF makes it easy** for the Department of State to accurately and quickly forward registration information from its branch offices to local election officials. The QVF also reduces the chance for election fraud. When the QVF was first developed, more than 600,000 duplicate and ineligible registrations were removed from the state's voter rolls.

In addition, the **QVF eliminates much of the paperwork** involved in tracking changes in voter registrations, making for a more effective and efficient process.

More than 400 communities are connected to the QVF server in Lansing through the Internet, including the state's 83 county clerks who function as a QVF source for about 1,200 smaller cities and townships. The QVF has been designed to assist local election officials with many of their duties, including petition and candidate tracking; keeping an electronic election calendar; and absent voter processing.

With the implementation of the QVF, Michigan has moved its election management system into the 21st century. Under the QVF, Michigan effectively meets the needs of a growing and increasingly mobile voter population while maintaining the integrity of the election process.

79.     After canvassing the petitions, if defendants determine the initiator submitted more than

252,523 valid signatures, they certify the measure, at which point the remaining provisions of

article 2 section 9 kick in, including consideration by the legislature. The path to the ballot and a

vote of the people occurs after the legislature either votes against it or takes no action.

80.     It is a violation of Michigan election law to sign a petition twice. Every petition must

contain the language, "WARNING A person who knowingly signs this petition more than once,

signs a name other than his or her own, signs when not a qualified and registered elector, or sets opposite his or her signature on a petition, a date other than the actual date the signature was affixed, is violating the provisions of the Michigan election law."

81.     The absurdity of it being illegal to sign twice unless someone is knowingly committing fraud, and then placing undue burdens such as clerk certifications or signor affidavits on certain signatures, complicates ballot access because rather than going through such a laborious process as the 1986 policy suggests, people could just sign the petition again and an older signature could be discarded—but Plaintiff is loathe to place hundreds of thousands of Michigan citizens in potential election law jeopardy simply for exercising their First Amendment rights of free expression, assembly, protest, redress for grievances, and to petition, by signing the petition again in an attempt to get a more 'fresh' signature from the same person.

82.     The term rebuttable presumption seems to appear only 7 times in Michigan election law, once in MCL 168.472 dealing with the 180 day policy, and six other times all relating to various initiative and recall petition laws where the QVF is checked to determine qualified elector status, and if the QVF indicates the person is not a qualified elector, there is an opportunity to rebut that presumption by submitting evidence. For initiatives *see*:

> 168.476 Petitions; canvass by board of state canvassers; use of qualified voter file; hearing upon complaint; investigations; completion date; disposition of challenges; report.
> Sec. 476. (1) Upon receiving notification of the filing of the petitions, the board of state canvassers shall canvass the petitions to ascertain if the petitions have been signed by the requisite number of qualified and registered electors. The qualified voter file shall be used to determine the validity of petition signatures by verifying the registration of signers and the genuineness of signatures on petitions when the qualified voter file contains digitized signatures. If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote, there is a **rebuttable presumption** that the signature is invalid. If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote in the city or township designated on the petition, there is a **rebuttable presumption** that the signature is invalid. If the board is unable to

verify the genuineness of a signature on a petition using the digitized signature contained in the qualified voter file, the board may cause any doubtful signatures to be checked against the registration records by the clerk of any political subdivision in which the petitions were circulated, to determine the authenticity of the signatures or to verify the registrations. Upon request, the clerk of any political subdivision shall cooperate fully with the board in determining the validity of doubtful signatures by rechecking the signature against registration records in an expeditious and proper manner.

*See also* for recalls:

168.961(6) The qualified voter file shall be used to determine the validity of recall petition signatures by verifying the registration of signers. If the qualified voter file indicates that, on the date the elector signed the recall petition, the elector was not registered to vote, there is a **rebuttable presumption** that the signature is invalid. If the qualified voter file indicates that, on the date the elector signed the recall petition, the elector was not registered to vote in the city or township designated on the recall petition, there is a **rebuttable presumption** that the signature is invalid………

**168.961a(4)** The qualified voter file may be used to determine the validity of a challenged petition signature appearing on a recall petition by verifying the registration of the signer. If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote, there is a **rebuttable presumption** that the signature is invalid. If the qualified voter file indicates that, on the date the elector signed the petition, the elector was not registered to vote in the city or township designated on the petition, there is a **rebuttable presumption** that the signature is invalid. (**emphasis added**).

## INAPPLICABILITY OF SB776 aka 2016 PA 142 TO PLAINTIFF

It appears Defendants concede the inapplicability of 2016 PA 142 to Plaintiff's case.

Defendants take the position that 2016 PA 142 has not been applied to Plaintiff's petitions and signatures filed with the BOE and BOC and will only be applied if a new petition is filed with the Defendants. Def's Briefs at pp. 35-38.  However, any order from the Court should make clear to all Defendants that 2016 PA 142 is not a lawful basis to deny Plaintiff any rights somewhere along the line in this process (such as a vote amongst the 4-person BOC for approval of ballot language, delivery to the Legislature, notices, etc.), as far as petitions already filed.

In *Doe v. Reed*, the Court held that signing an official petition is expressive speech (albeit with legal effect) because it involves the articulation of "a political view." 130 S. Ct. 2811, 2817 (2010). *Republican Party of Minn. v. White*, 536 U. S. 765, 788 (2002) , stated that a State "having 'cho[sen] to tap the energy and the legitimizing power of the democratic process, … must accord the participants in that process the First Amendment rights that attach to their roles.' " Ante, at 6.

## (2) WHETHER THE MOVANT WOULD SUFFER IRREPARABLE INJURY ABSENT A STAY

Michigan election law states that the Board of Canvassers must make a declaration of sufficiency or insufficiency of the petitions at least 2 months prior to the election, MCL 168.477(1), and also that the canvass must only be completed 2 months prior to the election. MCL168.476(2). **That date falls within September 2016.**  There is still time for the Court to do justice in this case.

The primary motivation in this suit is having Plaintiff's signature along with all of the other 350,000 signatures be completely canvassed for ballot access. Defendants ignore or fail to offer a valid defense for their actions related to Plaintiff's constitutional claims including whether the Legislature has authority to establish a rebuttable presumption in the first place; whether the BOC has authority to implement the 1986 rebuttable presumption policy; and whether statutory mandates related to the Qualified Voter File (QVF), and how now having the QVF, as opposed to when the 1986 BOC policy was put into effect, effects the whole issue of rebutting stale signatures even if the rebuttable presumption is lawful. Defendants' pleadings are devoid of a defense to the strict scrutiny analysis of the 1986 policy because Defendants have no plausible defense to argue,

weakly premising any defense on the incorrect assessment that Plaintiff has no First Amendment

claims, and ignoring relevant law regarding initiatives. On these dispositive issues it is clear relief

should be granted and judgment entered for Plaintiff.

## THERE IS TIME FOR THE COURT TO PROVIDE RELIEF

There are approximately 100 days until the next election. There is time for the Court to order relief and have Plaintiff's initiative placed on the November 2016 ballot.  Defendants must perform the canvass **immediately** to trigger enough time for the statutory 10-day challenge period, and the 40-day Legislative adoption or alternative process to occur, and the time period for approval of the actual 100-word ballot language, with final ballots ready for clerks at the earliest, ideally, by between **September 9-24, 2016**.

Military ballots need to be ready by September 24th, so there is still enough time for a normal canvass-- in 2012 the BOE and BOC processed six initiatives with vastly more signatures, time and energy required to canvass one petition this year—the one signed by Plaintiff. And the process here should be quicker because Plaintiff provided on June 1, 2016, information already rebutting at least 137,000 signatures, which is far more extensive of a canvass than even the state admittedly performs with its random sampling process. Defendants could have the petitions adequately canvassed in a matter of days if ordered to.

The BOE can clearly canvass a petition much quicker if necessary. If it was known by the BOE that it would take sixty days then Defendants should have in place processes for canvassing petitions turned in by any lawful submission date to allow sufficient time to perform duties. Defendants admit they will only sample 500 to 4,000 signatures. A 500-signature sample, or even 4,000, could be completed in one or two days, with notice immediately given to challengers of the results assuming the MILegalize petition qualifies. MILegalize has already canvassed and provided proofs of approximately 134,000 signors more than Defendants would ever verify with their own canvass. The court should order immediate sampling with no more than a few days for Defendants to comply. Defendants have had Plaintiff's petitions since June 1 and could have

diligently taken steps to canvass them by now, so any claims of prejudice due to a short timeframe are Defendants own fault.

Considering that MiLegalize has already proven by clear and convincing evidence that it filed enough valid voter signatures and that it can comply with a fair rebuttal process if necessary, there is no justification for Defendants to not immediately take all necessary steps to process and approve MiLegalize's petitions, which Plaintiff signed, for ballot qualification.


## THE 1986 BOARD OF CANVASSERS POLICY IMPOSES UNDUE BURDENS AND IS UNCONSTITUTIONAL

The 1986 policy runs afoul of the First Amendment under a strict scrutiny analysis. The policy has no compelling state interest, it is not the least burdensome means of achieving a compelling interest even if one exists, and it is not narrowly tailored. The BOC policy, by purporting to require that every signor more than 180 days old must also sign an affidavit, requiring a two-person team with a notary to locate 200,000-plus persons to accomplish, is in this case, practically the same as the BOC doubling the number of required signatures under Art 2, Sec 9 to qualify for the ballot (the BOC policy is even more burdensome then just requiring new signatures—which cannot be accomplished because it is a misdemeanor to sign a petition twice). The other purported option, to ship boxes of petitions and to coordinate with 1500-plus municipal clerks to rebut the signatures on an ongoing basis, is seemingly extremely laborious and burdensome. The narrowly tailored option—to use what state law commands to rebut the signatures—the QVF—would be the only lawful and acceptable option, and it is the option the BOC refuses to comply with.

A state need not grant initiatory petition rights to its citizens. But once a state does grant initiatory petitioning rights, those rights must comport with federal law including surviving a strict

scrutiny analysis of burdens placed on the process. The right to vote is a fundamental right, see, e.g., *Kramer v Union Free School Dist.*, 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969); *Reynolds v Sims*, 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506 (1964). While petitioning is not the same as the right to vote, petitioning is core political speech, which implicates First Amendment strict scrutiny review when it comes to the 1986 BOC policy, and the First Amendment, like all other fundamental and many other rights, applies to the states through the 14th Amendment. Michigan's constitution provides at least as much protection for these rights as the federal constitution, and in the case of petitioning for statutory initiatives, provides even greater rights under Art 2, Sec 9 of the 1963 Constitution. The People's Art 2, Sec 9 initiative rights should not be so flippantly infringed by Defendants.

As the Court stated in *Taxpayers United v Austin* regarding *Lott*:

> In *Meyer v. Grant*, 486 U.S. 414, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988), a case more recent than our unpublished decision in *Lott v Austin*, 1987 WL 38525, 1987 U.S.App. LEXIS 11163 (6th Cir. August 18, 1987), the Court struck down a Colorado provision that made it a felony to pay anyone to circulate a petition to get an initiative placed on the ballot. A unanimous Court concluded that although the right to an initiative is not guaranteed by the federal Constitution, once an initiative procedure is created, the state may not place restrictions on the exercise of the initiative that unduly burden First Amendment rights. Although *Meyer* dealt with a limitation on communication with voters and not with methods used to validate and invalidate signatures of voters to an initiative petition, the principle stated in *Meyer* is that a state that adopts an initiative procedure violates the federal Constitution if it unduly restricts the First Amendment rights of its citizens who support the initiative. Accordingly, we conclude that although the Constitution does not require a state to create an initiative procedure, if it creates such a procedure, the state cannot place restrictions on its use that violate the federal Constitution; therefore, we conclude, as did the district court, that the plaintiffs have stated a colorable claim under § 1983, giving the district court jurisdiction over this action. *Duke Power Co v Carolina Environ Study*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); *Oneida Indian Nation v Oneida*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974).

In *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), the Court held in determining whether an election law violates the First Amendment a court should

weigh the burden of the restriction against the State's interests:

> Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions.

*Id*. at 358, 117 S.Ct. 1364 (internal quotations and citations omitted); see also *Citizens for Tax Reform v. Deters*, 518 F.3d 375, 387 (6th Cir.2008) ("Although a state need not present 'elaborate, empirical verification' of the weight of its purported justification when the burden is moderate, it must come forward with compelling evidence when the burden is higher") (citations omitted).

*Bogaert v Land II*, 675 F Supp 2d at 749-750 is another oft quoted case. Accordingly, even under flexible analysis, the scrutiny here should be strict: the proposed regulation must be narrowly tailored to serve a compelling state interest. Furthermore, the *Bogaert v Land II* court found justification for not even bothering with the flexible approach, and rejected the distinction in petition types.

> Defendant's attempt to distinguish recall-petition circulation from other forms of petition circulation is not persuasive. Contrary to Defendant's suggestion, the proposition that the registration and residency requirements pose only a moderate burden on recall-petition circulators is not simply a matter of common sense. In fact, the existing case law and common sense tend to refute Defendant's argument for distinguishing recall petitions from initiative or candidate petitions. . . . [R]ecall-petition circulators resemble both initiative-petition circulators and candidate-petition circulators because they similarly seek ballot access.

*Bogaert v Land II*, 675 F Supp 2d at 750-751.

> This Court's previous determination that § 957 posed a severe burden on recall-petition circulators was based on a consistent line of federal cases that have concluded that residency or registration restrictions on petition circulators pose a severe burden on core political speech and are subject to strict scrutiny. (Dkt. No. 37, Op. 34-36.) See *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 194, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008); *Chandler v. City of Arvada*, 292 F.3d 1236, 1242 (10th Cir. 2002); *Lerman v. Bd. of Elections*, 232 F.3d 135, 149 (2d Cir. 2000); *Krislov v. Rednour*, 226 F.3d 851, 860 (7th Cir.2000). Subsequent to this Court's opinion on the preliminary injunction motion, the Sixth Circuit issued its opinion in *Nader v. Blackwell*, 545 F.3d 459 (6th Cir. 2008), in which it joined the other federal circuits

in extending the principles established in Buckley regarding initiative-petition circulators to candidate-petition circulators. Id. at 475-76 (applying strict scrutiny and holding that Ohio's registration and residency requirements for candidate-petition circulators violated the First Amendment). See also *Yes on Term Limits, Inc. v. Savage*, 550 F.3d 1023 (10th Cir. 2008) (applying strict scrutiny to analyze Oklahoma's ban on non-resident initiative-petition circulators).

None of Defendant's arguments convince this Court that its previous determination that the registration and residency requirements of § 957 impose a substantial burden on Plaintiff's First Amendment rights and are not narrowly tailored to Michigan's compelling interest in the integrity of recall petitions and the combat of election fraud was erroneous. The Court stands by its previous analysis. Rather than reiterating that analysis herein, the Court reaffirms and adopts that analysis by reference and declares that the requirements in Mich. Comp. Laws § 168.957 that recall-petition circulators be registered to vote and be residents of the legislative district of the official to be recalled are unconstitutional as a violation of the First Amendment of United States Constitution, applicable to the State of Michigan through the Fourteenth Amendment. (Dkt. No. 37, Op. 33-39.)

*Bogaert v Land II*, 675 F Supp 2d at 752. In *Buckley*, the Supreme Court struck down a Colorado

statute which required, inter alia, that initiative-petition circulators be registered voters. *Id*. The

Court extended its holding in *Meyer v. Grant*, 486 U.S. at 414, in which it rejected Colorado's ban

on paying ballot-initiative petition circulators. Justice Ginsburg, writing for the *Buckley* majority,

discussed the fundamental constitutional rights at stake in election petition circulation:

Petition circulation, we held, is "core political speech," because it involves "interactive communication concerning political change." First Amendment protection for such interaction, we agreed, is "at its zenith." We have also recognized, however, that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Buckley*, 525 U.S. at 183 (internal citations omitted.).
In this case, as in *Meyer*, the requirement "imposes a burden on political expression that the State has failed to justify." *Id*. at 428. *Buckley*, 525 U.S. at 194-195 (some internal citations omitted).

Keeping *Buckley* in mind, we examine the character and magnitude of the burden imposed by

requiring both the rebuttable presumption and the 1986 BOC policy on First Amendment rights

and the extent to which the law serves Michigan's interests. *Burdick v. Takushi*, 504 U.S. 428,

433-434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Laws which are severely burdensome to

constitutional freedoms must be narrowly tailored to serve compelling state interests, while less burdensome statutes receive less exacting scrutiny. *California Democratic Party v. Jones*, 120 S.Ct. at 2412.

The imposition of a rebuttable presumption requirement and the impossible to comply with 1986 BOC policy burdens the petitioners' and others' core freedoms of political expression and association. *See Buckley*, 525 U.S. at 183; *Krislov*, 226 F.3d at 858, 860-861. That is, petitioners may not associate for purposes of political expression by organizing nominating petition signature drives with whomever they wish. *See Meyer*, 486 U.S. at 424 ("The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."). It also limits the ability of petitioner's to conduct a citizens campaign to educate Michigan voters over an extended period of time. In this case, MILegalize found it more effective and important to run an 11-month campaign to educate Michigan voters and encourage discussion and inquiry into the proposal than a campaign limited to 180 days. Regardless of how long MiLegalize petitioned for, the initiative would be heard at the same election and the issue and language would remain the same.

Any suppression of voter rights must also be strictly construed. "[T]he right to recall public officials is an extremely important one which must be carefully guarded by the courts [. . .] statutes governing recall should be construed in favor of the right's exercise and [. . .] limitations on the right should be strictly  construed[.]" *Schmidt v Genesee Co Clerk*, 127 Mich App 694, 701-702; 339 NW2d 526 (1983).

**(3) WHETHER GRANTING THE INJUNCTION WOULD CAUSE SUBSTANTIAL HARM TO OTHERS**

Others would not be substantially harmed by granting the injunction because Plaintiff is only asking that Defendants do their job in providing ballot access according to the state constitution, in a manner which does not violate Plaintiffs' state and federal constitutional rights as outlined above.  A temporary restraining order compelling the defendants to canvass the signatures promptly enough to make the November ballot would not harm others but rather put the issue to a vote as is required under these circumstances to protect plaintiff's constitutional rights.

### FAILURE TO USE THE QVF AND TO ENFORCE THE 1986 BOC POLICY IS ARBITRARY AND CAPRICIOUS

Consider the facts and law: The BOE admits it uses and can use the QVF to canvass Plaintiff's petitions. **Def's Ex 1- Malerman Affidavit**. Given that, there is no rational basis to utilize the 1986 BOC Policy. Defendants are required to use the QVF by law. They are only going to sample between 500 and 4,000 signatures. Plaintiff already used a public version of the QVF to rebut approximately 138,000 signatures and gave the BOE records of such, yet Defendants are trying to argue, or rather in their motion completely fail to argue, how they can enforce the 1986 BOC policy in light of this. **Pltf Ex AA- Alan Fox Affidavit**. With serious questions about the legislative authority to even enact a rebuttable presumption, there is even less authority, if any (none has been cited), for the BOC to enact any rebuttable presumption policy, let alone an unworkable policy that has since been pre-empted by changes in state law and technology. Defendants in their 38-page response fail to offer a valid defense or deny Plaintiff's allegations of the impossibility of utilizing the 1986 policy, but cite it as justification for denying Plaintiff ballot qualification. It is simple: Defendants have no valid justification for not counting the

signatures of registered voters on Plaintiff's petitions. The Affidavit of Malerman is clear the relevant quantum of proof required by state law for checking voter registration and rebutting signatures is the QVF. The 1986 policy and several laws conflict. Analyzing *in pari materia* where the statutes are in conflict, the rules of the order of priority are: Where a law *in pari materia* with a previously passed law conflicts with the previously passed law, the conflicting portions of the latter law prevail over the provisions of the earlier law, and where a general law and a specific law conflict, the relevant portions of the specific law prevail, without regard to when the laws were enacted, unless there is specific legislative history showing the legislature intended a different result. *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n* (DPOA), 900 F.2d 903, 912 (6th Cir. 1990). Controlling law requires Defendants utilize the QVF.

## (4) WHETHER THE PUBLIC INTEREST WOULD BE SERVED BY GRANTING THE INJUNCTION.

The rebuttable presumption for signatures came about in 1973 after a woman referred to in the media as a Grand Rapids "housewife" came close to getting enough signatures on an initiative to reduce legislator pay and pensions (at that time, and at all times prior, you could circulate a petition for at least the 3 year, 7month period between governor elections, and given that the Legislature cannot legislate away your constitutional rights, you still can. The Legislature, in reaction to an attempt to lower their salaries, implemented the restriction, which afterwards, was not enforced until 1986, because the People's Lawyer former Michigan Attorney General Frank Kelley declared it unconstitutional. One of the legislators that voted for it afterwards changed his mind after he realized it made citizen-originated petitions (meaning those not run by big money or big political lobby groups) impossible.

The power struggle dynamic of trying to limit the people's voice is not new. The MILegalize and Plaintiffs' battle is only it's latest iteration, but perhaps the greatest chance to regain our lost rights in a long time. Who knows when we will have another chance to restore the right of ballot access if Plaintiff does not succeed in this litigation.

Further, "it is always in the public interest to prevent a violation of a party's constitutional rights." *G&V Lounge Inc v Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1979) citing *Gannett Co Inc v DePasquale*, 443 US 368, 383 (1979). The state has failed to justify any reason for enforcement of both the rebuttable presumption and the 1986 BOC policy.

"Statutes must be struck down if they reduce the number of qualifying initiatives and the exchange of ideas." *Meyer*, 486 US at 421. Both MCL 168.472a and the BOC's 1986 rebuttable presumption policy that is impossible to comply with must be struck down as unconstitutional.

**The 1986 Board of Canvassers policy is blatantly impossible to comply with and cannot be used to usurp the People's rights under Art 2, Sec 9 or the right of MILegalize to rebut the presumption of staleness with a clearly sufficient quantum of proof. This is a denial of due process and the Board of Canvassers cannot change the longstanding legal standard of what a rebuttable presumption in the law means—it simply means something is presumed until sufficient evidence is submitted as proof to overcome the presumption. MILegalize overcame the presumption yet its signatures are not being counted.**

The 1986 BOC alleged policy is impossible to comply with by any means, meaning that the BOC has made the "rebuttable presumption" now "irrebuttable", because the BOC knows that MILegalize and no one ever will be able to comply with the policy. This is a clear violation of both substantive and procedural due process under the 5th and 14th Amendments and Michigan's constitution Art I, Sec 17.

Just how burdensome is the 1986 policy? MILegalize had to rebut over 200,000 signatures. That means that each original petition sheet would have to be sent to each municipal clerk for every signor on an ongoing, rolling basis. So a 10-line petition could in theory have to go to ten

different clerks-- the same single petition sheet. So MILegalize would have to hire staff to oversee and manage this crucially important process have to mail the same petition to each clerk, whom if they did not refuse to rebut the signatures could rebut them on their own time schedule, and also demand that MILegalize pay for it. It's hard to calculate the specifics, but assuming the 55,000 petition sheets turned in contained approximately 200,000 signatures to rebut, this has MILegalize engaging in at least another 200,000 "transactions" with various clerks, all on a rolling, daily basis. This would cost conservatively at least another $125,000 in postage, assuming only one mailing to each clerk. That does not count manpower hours, phone calls to explain the process, etc. Nor does it count the cost the clerks would charge MILegalize for the process. For example, a single Ingham County petition might have to be sent first to the city clerk in Lansing, then back to the campaign. Then it could be sent to the Meridian Township clerk, then back to the campaign. Then to the Lansing Township clerk, then back to the campaign. Then to the Delhi Township clerk, then back to the campaign. Then to the East Lansing city clerk, then back to the campaign. Then to the Williamston clerk, then back to the campaign. Then to the city of Mason clerk, then back to the campaign. Then to the Leslie clerk, then back to the campaign. Then to the Stockbridge clerk, then back to the campaign. Assuming each clerk transaction would take at least a few days in the mail each way, and even if it was processed and sent back on the same day (unlikely), it could take two months or more to rebut the signatures on a single petition page. And MILegalize would have to do this everyday for months ultimately with tens of thousands of petition sheets being sent to the state's 1500-plus clerks. The burden is so insurmountable and costly no campaign prior to MILegalize has ever even tried to comply with it.

If the burdensome logistics of the 1986 policy are not enough to convince everyone that the policy is too burdensome, the fact that clerks have no legal duty to assist MILegalize, and the

fact that clerks refused to assist MILegalize and others, means that the policy could not be complied with even if MILegalize had unlimited manpower and financial resources and did everything in its own power to facilitate the process.

Even more damning, the Bureau of Elections told clerks they did not have to assist campaigns in rebutting. So at the same time Defendants are demanding MILegalize can only rebut using the 1986 policy, Defendants are at the same time frustrating MILegalize ability to do so by telling clerks they do not have to comply. This is undisputed from the clerks emails with the Bureau in the lower court record.

From the lower court record it is also clear, no clerks have ever rebutted signatures, nor have any clerks offices received training to do so. Part of the reason is likely that the 1986 policy runs afoul of Headlee, as it is a post-1978 unfunded mandate to local governments that was not funded at the time of enacting Headlee, and no funds were appropriated to cover municipal clerks office to perform the service. Unfunded mandates are prohibited by Headlee and another reason the 1986 policy is not lawful.

Lastly, asking the board of canvassers, the same body that is not neutral and that refused to adopt a workable policy to rebut signatures, to then by the same body that determines the sufficiency of signatures, is troubling from a due process perspective. The board members were clearly not neutral, with one of the four board members leaving during two meetings while the policy was being discussed, one time even running out of the Capitol and being chased by reporters. That same board and person then make the decision not to count Plaintiff's and the other petition signers' signatures due to failing to comply with the board's policy that the board knows to be unworkable.

Courts across the country have recognized that a law or policy cannot be impossible to comply with. In July 2016, the US Supreme Court struck down Texas's "admitting privilege" law because it placed an undue burden on Texas women seeking abortions. The rationale argued was that because hospitals did not have to grant privileges, abortion clinics would have to close. *Whole Woman's Health v Hellerstedt*. The law was struck down because it placed "…. a substantial obstacle in the path of women seeking a previability abortion, constitute an undue burden on abortion access, and thus violate the Constitution." Similar reasoning applies to this case. The 1986 BOC policy places "substantial obstacles" on Appellants petitioning rights, constituting an "undue burden" that "violates the Constitution."

### Request for Relief

Order Defendants to stop any printing of ballots until this matter is resolved;

Order Defendants to canvass and count the MILegalize petition signatures, including Plaintiff's, immediately, and to complete the work within 3-days, in order to give time to put the 100 word summary on the November 2016 presidential election ballot.

It appears Defendants concede the inapplicability of 2016 PA 142 to Plaintiff's case, from state court documents filed by Defendants. Defendants take the position that 2016 PA 142 has not been applied to Plaintiff's petitions and signatures filed with the BOE and BOC and will only be applied if a new petition is filed with the Defendants. Def's Briefs at pp. 35-38. However, any order from the Court should make clear to all Defendants that 2016 PA 142 is not a lawful basis to deny Plaintiff any rights somewhere along the line in this process (such as a vote amongst the 4-person BOC for approval of ballot language, delivery to the Legislature, notices, etc.), as far as petitions already filed.

September 8, 2016.                    s/Thomas Lavigne
                                     Thomas Lavigne (Mich Bar P58395)
                                     Law Firm of Cannabis Counsel PLC
                                     2930 Jefferson Avenue East
                                     Detroit, MI 48207
                                     (313) 446-2235
                                     Michael Komorn (P47970)
                                     Attorneys for Plaintiffs